UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION



MARY E. RIDDLE,                  }
                                 }
        Plaintiff,                }
                                 }
v.                               }           CV 01-AR-3100-J
                                 }
GRAYSON LUMBER CORPORATION,      }
                                 }
        Defendant.                }

**MEMORANDUM OPINION**

Before the court is a motion for summary judgment filed by defendant, Grayson Lumber Corporation ("Grayson"). Plaintiff, Mary E. Riddle ("Riddle"), instituted this action against her employer, Grayson, asserting claims under Title VII, 42 U.S.C. § 2000e, et seq. Riddle alleges that her supervisor, Steve Long ("Long"), sexually harassed her from about September, 1999, until she was terminated by Grayson in retaliation for her vocal opposition to Long's harassment.

### Facts

Riddle began her employment with Grayson in December, 1993. During the time the alleged sexual harassment occurred, Riddle worked in the scale house at Grayson weighing log trucks. She contends that some time during September, 1999, Long, Grayson's general manager, began to act in a manner that made her feel uncomfortable. According to Riddle, Long would come into the "scale house" and leer at her. Additionally, while leering, Long

would comment on how good she looked and how pretty she was. Riddle described Long's behavior as "looking you up and down." According to Riddle, Long would repeat this behavior four or five times a day. Riddle also recalled that on one occasion, Long discussed with her that he slept in the nude, and that Long would often lead the conversation around to sexual matters. He also commented on Riddle's husband being jealous of them. Riddle contends that she was bothered by Long's behavior, and she informed him to stay away from her. Riddle alleged in her complaint that in the latter part of January, she told Long "that the sexual harassment had to stop and that she did not want to have any more contact with him on the job." (Compl. ¶ 9). Riddle testified in her deposition that she told Long "to keep his ass away from [her] and if he had anything for [her] to say or do to go through Mike Ayers to do it." (Pltff's Depo. at p. 120-2). Mike Ayers ("Ayers"), was Riddle's direct supervisor. Riddle testified that Ayers told her the next day after she confronted Long that Long had directed him, Ayers, to get rid of her, or he would lose his job.[1] Riddle asserts that this behavior continued until she was terminated, and that she was terminated in retaliation for opposing Long's behavior toward her. Long denies

---

[1] Ayers denies that he ever told Riddle that Long had told him to get rid of her. (Ayer's affidavit). In any case, this is hearsay testimony that cannot be reduced to admissible testimony at trial. Accordingly, the court will not consider this testimony in ruling on Grayson's motion for summary judgment.

2

that Riddle ever confronted him or ask him to stay away from her.

Grayson disputes Riddle's allegation that she was sexually harassed by Long, and contends to the contrary that Riddle began having performance problems during the last year of her employment. Grayson contends that truck drivers delivering to the lumber yard began complaining about Riddle's rude and abusive treatment. According to Long, he was concerned about losing customers so he transferred Riddle's telephone answering duties to someone else in the office. Grayson also contends that during the last year of Riddle's employment she developed a habit of being tardy to her work station, and not being ready to work at the appointed time, 6:00 a.m. Grayson contends that Riddle was tardy as much as one or more times each week. Grayson maintains that according to policy, employees are expected to arrive in time to be at their respective duty stations and ready to work when their shift begins. According to Long, after several employees were counseled and/or disciplined for tardiness, they complained to Long about Riddle's frequent tardiness, and the fact that she had not been disciplined or reprimanded. Long contends that he met with Riddle, and she agreed to improve. Grayson maintains that Riddle's tardiness continued, so she was placed on 90 days probation. According to Long, while Riddle was on probation, Long ask Ray Alexander ("Alexander") and Ayers, to supervise her arrival time, and to report to him if she was

tardy. According to Grayson's policy, Riddle could be terminated for arriving to work tardy just once while on probation. Grayson contends that Riddle's performance while she was on probation was spotty at best. Long testified that he could have terminated Riddle on several occasions during her probationary period due to her tardiness, but he chose to excuse several incidences because he did not want to terminate her. According to Grayson, Riddle's probation period lasted until shortly before Christmas in 1999.

Riddle disputes that she was ever placed on probation for tardiness. (Riddle Affidavit). Riddle recalls Long's speaking to the log crew as a whole about tardiness, but contends she was never singled out for counseling regarding her tardiness. Riddle also maintains that her employee file contains no written counseling or notes of verbal counseling for any deficiency in her work, and she does not recall ever being verbally counseled for a deficiency. According to Grayson's employee handbook, an employee is not put on probation until they receive two verbal warnings. (Pltff's Opposition Exh. 4 at GL 0062). If disciplinary measures are still required the employee is issued a written warning accompanied by a term of probation. *Id*.

Riddle testified that she arrived at work on February 4, 2000, shortly before 6:00 a.m.[2] Riddle contends that she was

---

[2]Riddle contends that she arrived at her duty station and was working at 5:55 a.m. as evidenced by a weigh-in ticket stamped with that time. Grayson, however, disputes that Riddle

4

sick, but went to work anyway because it was Long's policy for sick employees to report to work, and then to leave if they were too sick to work. Alexander submitted affidavit testimony that he observed Riddle arriving late on that date, and he spoke with Ayers about it. According to their affidavit testimony, Ayers and Alexander decided to confront Riddle rather than speak with Long directly. Ayers confronted Riddle about being tardy. Riddle contends that when she was confronted with the accusation of being tardy, she pointed out to Ayers that she had a weigh-in ticket stamped at 5:55 a.m. Grayson maintains that the scale clock was slow and that everyone at Grayson knew it was slow by seven to ten minutes. Riddle contends that Ayers never mentioned that the scale clock was slow by seven to ten minutes. Furthermore, Riddle contends that she was unaware that the scale clock was slow and that to her knowledge it kept the correct time. According to Ayers, Riddle became angry when she was confronted with the accusation of being tardy, and she left. It is Grayson's position that Riddle left her work station without permission because she was angry, and that this is tantamount to

---

was on time. It is Grayson's position that the clock on the scales was routinely slow and that Riddle knew this because it was a matter of common knowledge. Grayson contends that Riddle arrived late according to the time on Alexander's watch, which Long had predesignated to be the official time for Riddle to arrive. Riddle disputes that any watch was ever designated to be the official time piece or that she was on probation for tardiness.

quitting and/or grounds for termination. Riddle does not dispute that she was angry, but asserts that she was sick, that she had informed Ayers that she was sick, and that she informed Ayers that she was going to the doctor. Riddle left Grayson on the morning of February 4, 2000. Ayers and Alexander stated that they reported to Long that Riddle had left angry over being accused of being tardy and had left her duty station without permission. Riddle returned to Grayson 15 to 20 minutes later. According to Riddle she returned to Grayson to pick up her check because it was pay day. Grayson disputes that Riddle was there for her check because checks are given out at the morning break several hours after Riddle was there in the morning. When Riddle returned, Ayers asked her if she had quit her job. Riddle contends that she reminded him that she had said she was going to the doctor because she was sick. Riddle asserts that she did not tell anyone that she quit her job, and that she left her duty station after informing her supervisor that she was ill and was going to the doctor. Riddle said she then requested a meeting with Long to which he agreed.[3] Riddle asserts that she was not terminated on that day because Long told her to come back on Friday, February 11, 2000, and they would discuss the situation.

Long has a different view of the events of February 4, 2000.

---

[3] Riddle and Grayson have differing versions of the events that transpired on February 4, 2000, and different views as to whether Riddle was in fact terminated on this day.

According to Long, he told Riddle that anyone who walked off the job and left the property without permission, as she had done, was considered to have quit, and that she was no exception. Long recalls Riddle's getting quite agitated at that point. He maintains that he handed her what he considered to be her last pay check, and told her that if she wanted to talk any further she would have to come back in one week "about dinner time." It is Grayson's position that the check confirms that Riddle was terminated at that time. Riddle argues, however, that the check was just her weekly check, and that it was her understanding that she was suppose to return to work in a week to talk with Long about the situation.

After leaving Grayson, Riddle called her doctor, Dr. James Moody (Dr. "Moody"), and was seen by him later that day. Dr. Moody gave Riddle a note directing her to take medical leave for two weeks.

Some time during the week of February 4 through February 11, 2000, Riddle telephoned Mr. Schmidbauer ("Schmidbauer"), Grayson's owner, and complained about Long's alleged sexual harassment, and made other accusations against Long. Prior to her complaint to Schmidbauer, Riddle admits that she had never complained to anyone about the sexual harassment, but she contends that prior to that time she had been "dropping hints" to Schmidbauer that something was wrong and that he needed to check

it out.[4]  Riddle also testified that she confronted Long about the sexual harassment.  Riddle also maintains that Ayers should have suspected something because she told him she did not want Long around her any more.  Ayers disputes that Riddle ever dropped "hints" about Long.

According to Schmidbauer, the telephone conversation between himself and Riddle took place on February 10, 2000, and during that conversation Riddle told him that she had been fired on February 4, 2000.  Schmidbauer testified that Riddle told him she was fired because she had "figured out" that Long was involved in a scheme whereby grade lumber was being sold for scrap lumber prices.  According to Schmidbauer, Riddle did mention that Long had made inappropriate comments to her, but she did not give him any specifics except to say that in her opinion, Long was a very manipulative and domineering man.  Schmidbauer also said that Riddle had said that it was her opinion that Long forced Ayers to harass her about her tardiness because she had figure out what was happening with the lumber.  Schmidbauer asserts that Riddle

---

[4]It is Riddle's position that she never received any training on how to deal with sexual harassment matters.  Riddle states that she believed Long's conduct to be sexual harassment, but she did not know how to report it because of the lack of a sexual harassment policy.  Riddle contends that she did not receive any instruction on personnel procedures or any kind of orientation when she started to work in 1993, and she did not receive an employee handbook.  The employee handbook produce as evidence by Riddle and referred to regarding probationary procedures was distributed by Grayson after Riddle left its employment.

never mentioned any other complaints of sexual harassment. Schmidbauer testified that he phoned Long and told him of Riddle's allegations, and asked him if he had done anything that would be considered harassment, and he said that he had not. Schmidbauer also testified that he reviewed Riddle's termination and agreed with Long that she had quit her position when she left without permission on February 4, 2000.

Riddle returned to Grayson on February 11, 2000, some time around 11:00 a.m., as Long had directed. Long testified that Stacy Parker ("Parker"), the mill supervisor, accompanied him to talk with Riddle. As they approached Riddle, Long ask her if she still wanted to talk. Long testified that Riddle suggested that they have a private talk in his office, however, Long refused, stating that he had no intention of being alone with her. According to Long, the conversation ended when he told Riddle that they could talk outside with Parker present. Long contends that it was later that same day when Schmidbauer phoned him and let him know about Riddle's accusations against him.

Riddle has a slightly different recollection of the events of February 11, 2000. According to Riddle, when she saw Long he said that he understood she wanted to talk to him, to which she replied that she had returned to work as he had instructed her to do. According to Riddle, Long said that he did not have anything to say to her, and he then ask her if she had anything to say to

9

him.  Riddle stated that she suggested that they talk in his office.  According to Riddle, Long's reply was that he did not believe that they should be alone together, and he then requested that she leave.  Riddle asserts that Long's decision to terminate her on February 11, 2000, is a product of the collaboration between Long and Schmidbauer, and that she was terminated at that time because she complained of sexual harassment.  The absence of the pay record reflecting whether Riddle was on the payroll to February 4 or February 11 is unexplained by either party.

## Analysis

The analysis begins with the well known and often quoted standard under Fed. R. Civ. P. 56 for when summary judgment is appropriate.  Summary judgment is to be entered only "if the pleadings, depositions, answers to interrogatories ... [and] affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56.  "A factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Technologies, Inc.*, 882 F.2d 993, 996 (5th Cir. 1989)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986); *accord Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir.

1992).  In deciding whether the moving party has shown that there is an absence of a genuine issue as to any material fact, "the court *must* view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." *GrandQuest v. Mobile Pulley & Machine Works, Inc.* 163 F. Supp.2d 1338 (S.D. Ala. 2001) *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598 (1970).  "'*The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in h[er] favor.*'" *GrandQuest*, 163 F. Supp. 2d at 1343 (quoting *Anderson*, 477 U.S. at 255).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *GrandQuest*, 163 F. Supp. 2d at 1343 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Under Title VII an employer is prohibited from discriminating "against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). "Sexual harassment can constitute discrimination based on sex for purposes of Title VII." *GrandQuest*, 163 F. Supp. 2d at 1344 (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244-45 (11th Cir. 1999)).  Traditionally, there were two forms of sexual harassment:  "harassment that does not result in a tangible employment action, often referred to as 'hostile work

environment' harassment, and harassment that does result in a tangible employment action, often referred to as 'quid pro quo' harassment.  *GrandQuest*, 163 F. Supp. 2d at 1344 (citing generally *Burlington Industries, Inc., v. Ellerth*, 524 U.S. 742, 760-63 (1998)).  "When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Burlington*, 118 S. Ct. at 2265.  The Supreme Court has now limited the utility of distinguishing between the two forms of sexual harassment claims "to when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII.  *Burlington*, 118 S. Ct. at 2265.  The instant action appears to raise such a question.

In the present action, Riddle alleges that Grayson's general manager, Long, sexually harassed her during the fall of 1999 and that she was terminated on February 11, 2000, after she had told Long to leave her alone and had informed the company owner of her complaint.  Riddle contends that she was retaliated against because she reported the sexual harassment to Schmidbauer. Clearly, Riddle does not contend that Long's comments explicitly conditioned any job benefit or detriment upon any compliance with an explicit request for sex.  Instead, Riddle relies on the

12

inference of a threat of adverse employment action if she was not responsive to Long's sexual interest, as exhibited by his conduct towards her.  Riddle apparently contends that there is a sufficient nexus between Long's conduct, her telling him to "keep his ass away from her," the harassment over her being allegedly tardy, and her termination to make out an implicit claim of 'quid pro quo' sexual harassment.  Riddle's allegations therefore fall within the 'quid pro quo' category, distinguishing the instant action from those line of cases where a plaintiff, absent "explicit" discrimination, must show that the conduct was "sufficiently sever or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999) citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S. Ct. 2399 (1986).  "In order to establish a claim of 'quid pro quo' harassment [Riddle] must show (1) that she belongs to a protected group, (2) that she was subjected to unwelcome sexual harassment, (3) that the harassment complained of was based on gender, and (4) that her reaction to the harassment affected tangible aspects of her compensation, or terms, conditions or privileges of employment."  *Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir. 1982).  The pivotal question in the instant action is whether Riddle was harassed about being tardy and terminated in reprisal because she did not respond favorably to Long's implicit

13

sexual interest. In light of the totality of the circumstances in the present action taking Riddle's evidence as true and drawing all justifiable inferences in her favor, as the court must, the court finds that there is barely enough evidence to create a triable issue over whether Riddle was subjected to *quid pro quo* sexual harassment. Long was Riddle's supervisor and the general manager of Grayson. A reasonable objective person could conclude from Long's conduct and the events leading up to Riddle's termination that there was an implied demand for Riddle's to reciprocate his sexual interest, and that when she rebuffed him he sought grounds for her termination. The fact that Long denies the alleged conduct and presents supporting testimony of several employees that he did not have the propensity for such conduct, calls for a credibility assessment, precluding summary judgment. *Early v. Morris Newspaper Corp.*, 54 F. Supp. 2d 1261, 1270 (1999). Finally, accepting Riddle's contention that the final decision to terminate her employment was not made until after she spoke to Schmidbauer about Long's sexual harassment, coupled with the fact that Grayson did not have a sexual harassment policy in place to afford Riddle the opportunity to complain earlier, the court finds that there is sufficient evidence to raise a triable issue of sexual harassment. Although the court finds that Riddle has raised a triable issue as to her *quid pro quo* claim, the court does not

believe that the conduct Riddle complains of is "sufficiently severe or pervasive [enough] 'to alter the conditions of [her] employment and create an abusive work environment'." *Meritor*, 477 U.S. at 67, 106 S. Ct. at 2399 (quoting *Henson*, 682 F.2d at 904).

## Retaliation

A plaintiff can establish a *prima facie* case of retaliation by either direct evidence or circumstantial evidence. Riddle presents circumstantial evidence that she was retaliated against because she opposed Long's sexual harassment. Riddle has submitted affidavit and deposition testimony in opposition to Grayson's motion for summary judgment as follows:

> she believed that Long's conduct constituted sexual harassment; she never received an employee handbook or instruction on Grayson's sexual harassment policy; she ask Long to leave her alone; she was never singled out for a reprimand or received verbal or written counseling for being tardy; she was never on probation for being tardy; her record does not contain any evidence of such; she does not recall ever being counseled for any work deficiency; she was not late on February 4, 2000; Grayson does not have a time clock; she was not aware that the clock on the scale was slow and in need of calibration; no one ever told her that she was to arrive by 6:00 a.m. according to Ayer's watch, or anyone else's watch; she did not walk off the job; she left after telling her supervisor that she was going to the doctor; she was not terminated on February 4, 2000, but instead was terminated on February 11, 2000, when she returned to work a week later as directed by Long; she did call Schmidbauer and complained about Long's sexual harassment, and; she was terminate after complaining to Schmidbauer about the sexual harassment.

Because Riddle is relying on circumstantial evidence to show

discriminatory retaliation, she must show "(1) that she engaged in statutorily protected activity, (2) that she alleged an adverse employment action, and (3) that the adverse employment action was causally related to her protected activity." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186087 (11th Cir. 2001). Riddle argues that she has established a *prima facie* case of retaliation. If she complained to Schmidbauer about Long's sexual harassment, she was engaged in protected activity. Riddle contends that she suffered an adverse employment action because she was terminated. And finally, Riddle contends that the third prong of the analysis is satisfied because there is a causal connection between her termination, and her protected activity due to the temporal relationship between her complaint to Schmidbauer and her termination on February 11, 2000.

Assuming *arguendo* that Riddle has established her *prima facie* case of retaliation, the burden then shifts to Grayson to rebut the presumption of retaliation by proffering a legitimate non-retaliatory reason for its employment action. At this stage, Grayson's burden is very light, it has only the burden of production and not the burden of persuasion. According to Grayson, Long terminated Riddle because she left the premises the morning of February 4, 2000, after being accused of tardiness. Because Grayson has proffered a legitimate reason for terminating

Riddle, she must produce "sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000). Riddle has submitted both affidavit and deposition testimony disputing Grayson's reasons for terminating her in opposition to Grayson's motion for summary judgment. The court finds that Riddle has submitted sufficient evidence to constitute an arguable rebuttal of Grayson's proffered legitimate business reason for terminating her employment.

Grayson has submitted a well drafted 115 page brief in support of its motion for summary judgment. Riddle, on the other hand, has submitted a bare bones eight page brief in opposition to Grayson's motion for summary judgment. On a motion for summary judgment Riddle's evidence *"is to be believed, and all justifiable inferences are to be drawn in h[er] favor.'" GrandQuest*, 163 F. Supp. 2d at 1343 (quoting *Anderson*, 477 U.S. at 255). Because the court cannot weigh the credibility or weight of the evidence on a motion for summary, the court finds that Riddle has submitted sufficient evidence to resist a Rule 56 motion addressed to her claims of sexual harassment and retaliation.

## Conclusion

For the foregoing reasons summary judgment for Grayson will

17

be denied.  A separate and appropriate order will be entered.

DONE this __11th__ day of February 2003.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE